UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| HAYMAKER DEVELOPMENT COMPANY, LLC, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 5: 20-478-DCR |
| V. | ) ) | |
| C.M. GATTON, et al., | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

C.M. Gatton doesn't want to do business with Timothy Haymaker any longer. Gatton has sold numerous parcels of real property to Haymaker over the past 30 or so years, which Haymaker then developed and sold to third parties. But in 2020, Gatton refused to sell Haymaker additional land. As a result, Haymaker brought this lawsuit, alleging that Gatton is required to continue selling him property pursuant to an alleged oral partnership agreement. Gatton responded with a counterclaim, alleging that Haymaker committed slander of title when he filed a notice of lis pendens with respect to the subject property. And both parties have filed motions for summary judgment.

After reviewing the parties' filings, the undersigned concludes that the defendants' motion for summary judgment concerning Haymaker's partnership claims should be granted. Haymaker has identified facts that, at best, establish a partnership at will which Gatton was free to dissolve at any time. However, genuine issues of material fact exist regarding Gatton's counterclaim that Haymaker acted maliciously in filing a notice of lis pendens and, if so, what damages Gatton incurred as a result. As a result, Haymaker's motion for summary judgment

- 1 -

regarding the defendants' counterclaim will be denied.  The defendants' motion for summary judgment regarding the counterclaim will be granted, in part.

## I.     Background

Defendant C.M. "Bill" Gatton ("Gatton") made his first real estate investment more than eight decades ago, when he was eight years old.  Gatton, a successful entrepreneur, has gone on to make numerous other investments over the years.  He is presently Trustee of Defendant C.M. Gatton Trust ("the Trust"), an *inter vivos* trust established on January 7, 1995.

Timothy Haymaker ("Haymaker") has been involved in the real estate business for nearly 50 years.  He was Vice President of Real Estate at First Security National Bank before starting his own real estate development business in 1989.  Haymaker is the sole member of Plaintiff Haymaker Development Company, LLC.[1]

Gatton and Haymaker first met in the late 1980s.  Gatton was considering establishing a Hyundai dealership in Lexington, Kentucky, and met with an acquaintance at First Security National Bank regarding a possible location.   The acquaintance introduced Gatton to Haymaker, since he "knew the market and maybe knew some land [that] was for sale." [Record No. 52-8, p. 22]

Sometime thereafter, Gatton invited Haymaker to attend the Masters golf tournament in Augusta, Georgia.  Haymaker and Gatton discussed some property that First Security had been trying to sell, which later became known as the "Beaumont property."[2]  Haymaker no longer worked for the bank at that point, but was under a consulting contract with respect to

---

[1]     Unless otherwise noted, "Haymaker" will be used interchangeably to refer to Timothy Haymaker and Haymaker Development Company, LLC.

[2]     The property was previously known as the "Headley Farm."  [*See* Record No. 59-3, p. 18.]

the Beaumont property under which First Security paid him $100,000 per year. [Record No. 59-3, p. 16] Gatton believed that the property would be a good investment due to its location. [Record No. 52-8, p. 27]

The two discussed the property again on a separate occasion while Haymaker drove Gatton to the airport. According to Haymaker, Gatton stated, "I'll give them $12 million for it." But Haymaker advised that the seller would not accept the offer and, instead, would ask $19 million. Haymaker contends that after Gatton exited the car, he reached into the window and "punched" Haymaker in the chest, stating, "I'll give them $15 million, but that's it." [Record No. 59-3, p. 20] Haymaker reportedly responded, "[W]e're talking. We'll get someplace with $15 million, but you're going to have to pay $17 million." Gatton denies touching Haymaker's chest but concedes that he negotiated regarding the price of the property.

Gatton ultimately purchased the Beaumont property on September 2, 1994, for a total of $16,296,000.[3] *Id.* at 18. On November 17, 2003, Gatton purchased 563 acres of undeveloped land in Fayette County, Kentucky, from Akbar, LLC and Preston and Anita Madden, for $21,264,700. This is known as the Hamburg property. [*See* Record No. 53-33.] On May 30, 2003, and April 13, 2004, Gatton purchased two additional parcels of property for $13,701,000, which totaled 264 acres; this made up the Coventry acreage. [*See* Record Nos. 52-3; 52-4.] Gatton purchased this property with his funds, and it was deeded to the Gatton Trust in fee simple absolute.

Gatton sold Haymaker portions of these properties in later years. [*See* Record No. 52-12.] Haymaker, however, did not pay cash for the properties. Instead, the parties executed

---

[3]    Gatton purchased the property through his limited liability company, Beaumont Investments LLC. [*See* Record Nos. 59-3, p. 18; 52-30.]

promissory notes, personally guaranteed by Haymaker, under which Haymaker Development promised to repay Gatton.[4]  The parties executed a deed on each occasion, transferring the subject property to Haymaker in fee simple.  Haymaker would then obtain construction loans from banks to develop the property, using the property as collateral.

Gatton always maintained that he was an investor—not a developer—and aimed to ensure that he would receive capital gains tax treatment on the sales proceeds of the land. However, the parties' formula for determining the purchase price reflects their understanding that Haymaker would develop the property and sell it to third parties.  Haymaker's accountant Carol Moses explained that Haymaker would put together "pro formas" or land price calculations to determine a sales price for the land sold from the Gatton Trust to Haymaker Development.  [Record No. 59-15, p. 17]  First, Gatton would first determine his basis in the property and provide that number to Haymaker.  Then, Haymaker would determine the anticipated profits that he would realize from the eventual sale.  Haymaker's purchase price was typically Gatton's basis, plus 70 percent of expected profits.  [Record Nos. 59-9, p. 5; 59-15, pp. 18-19]  After Haymaker developed and sold land that he had purchased from Gatton, the actual sales figures were plugged into a "rollforward schedule."  [Record Nos. 59-9, p. 6; 60-3; 53-6, p. 33]  If a development performed better (or worse) than anticipated, the rollforward schedule would reflect a "catch up" or "carryforward" amount that could be factored into the purchase price on the subsequent purchase of a unit of land.

Despite the longstanding nature of the parties' business relationship, it was not without problems.  Haymaker was not always able to repay Gatton on time and, at one point, owed

---

[4]    On one occasion, the Bill Gatton Foundation served as Haymaker's lender with the Trust serving as lender in the remaining transactions.  [*See* Record No. 52-7.]

Gatton 20 million dollars.  [Record No. 59-3, p. 54] Although upset, Gatton forgave two million dollars of the debt and continued selling land when Haymaker had a third-party buyer lined up.  *Id.*  According to Gatton, he did so to maximize Haymaker's profit and enable Haymaker to repay him.  [*See* Record No. 52-10.]  And eventually, Haymaker was able to pay down the loans.

Gatton sold Haymaker nearly 86 acres of land for approximately four million dollars as recently as June 2020.  [Record No. 52-12]  Later that same year, Haymaker approached Gatton about purchasing an additional portion of the Hamburg property, but Gatton refused to sell. [Record No. 59-3, p. 79]  According to Haymaker, Gatton called him personally and told him that he had "made a lot of money off of [Gatton] and [he] wasn't going to make any more." *Id.*

Haymaker filed his Complaint in the Fayette Circuit Court on November 5, 2020, alleging that Haymaker and Gatton engaged in a partnership or joint venture and that Haymaker is entitled to partnership assets based on the Hamburg and Coventry developments. Haymaker also claims that Gatton and the Trust have breached their fiduciary duties by failing to develop the remaining property pursuant to the alleged partnership agreement.  Shortly after filing the Complaint, Haymaker filed a notice of lis pendens with respect to the portions of the Hamburg and Coventry property Gatton has not sold him.  The defendants removed the case to this Court based on diversity jurisdiction on November 30, 2020.  They subsequently asserted a counterclaim, alleging that Haymaker's filing of lis pendens constitutes slander of title on Gatton's property.  As noted, both sides have filed motions for summary judgment.

## II.     Standard of Review

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute regarding any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Once the moving party has satisfied this burden, the burden shifts to the nonmovant.  The nonmoving party may not simply rely on its pleadings but must "produce evidence that results in a conflict of material fact to be resolved by a jury."  *Cox v. Ky. Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).  In other words, the nonmoving party must present "significant probative evidence that establishes more than some metaphysical doubt as to the material facts."  *Golden v. Mirabile Invest. Corp.*, 724 F. App'x 441, 445 (6th Cir. 2018) (citation and alteration omitted).

The Court affords all reasonable inferences and construes the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, a dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party.  Further, the Court may not weigh the evidence or make credibility determinations, but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  *See also Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).  The existence of a scintilla of evidence favoring the nonmovant is not sufficient to avoid summary judgment.  *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 851 (6th Cir. 2017) (citing *Anderson*, 477 U.S. at 252).

### III.   Discussion

#### A.   Haymaker's Partnership Claims

##### 1.   The parties' relationship lacks formal indicia of a partnership.

Haymaker maintains that the defendants are required to sell the remaining Hamburg and Coventry acreages. Both parties acknowledge that Kentucky's Statute of Frauds generally requires a contract for the sale of real estate to be in writing. *See* K.R.S. § 371.010(6). Here, it is undisputed that there is no written agreement requiring Gatton to convey any additional property to Haymaker. However, Haymaker contends that Hamburg and Coventry are partnership properties that Haymaker is entitled to purchase under the parties' alleged partnership agreement and, thus, fall outside of the Statue of Frauds. To succeed under this theory, Haymaker must show that the parties entered into a binding partnership agreement and that the remaining Hamburg and Coventry properties were purchased for the partnership. *See Goodwin v. Smith*, 137 S.W. 789, 789 (Ky. 1911) (citing *Garth v. Davis & Johnson*, 85 S.W.692 (Ky. 1905); *Wiedemann v. Crawford*, 134 S.W. 495 (Ky. 1911)). Gatton vehemently denies that a partnership between them ever existed.

A partnership is defined as an association of two or more persons to carry on as co-owners of a business for profit. *See* K.R.S. § 362.175(1). Haymaker has demonstrated some difficulty identifying the circumstances surrounding the formation of the alleged partnership. Haymaker stated in an answer to interrogatories that the partnership was formed during the development of Unit 4 of the Beaumont acreage in 1995.[5]  [*See* Record No. 59-3, p. 23.]  But during his deposition, Haymaker testified that the partnership actually began during Haymaker

---

[5]   Haymaker explained that this was the first unit that he and Gatton worked on together after Gatton purchased the Beaumont Acreage.

and Gatton's 1994 airport-conversation regarding the price of the Beaumont property. *Id.* at 24. Haymaker went on to clarify that the alleged partnership was formed "everywhere" over the course of the parties' 30-year relationship. *Id.* at 27.

Notwithstanding Haymaker's uncertainty regarding the partnership's formation, an express agreement is not necessarily required and a partnership can be implied based on the parties' words and actions. *See Comm'r of IRS v. Olds*, 60 F.2d 252, 254 (6th Cir. 1932) (observing that a partnership agreement can be express or implied). Each case is assessed individually based on its facts and circumstances. *See Thale v. Collector Imps, LLC*, 2008 WL 4386769 (W.D. Ky. Sept. 23, 2008).

The parties have identified a number of characteristics the Court should examine, including: whether the partnership is memorialized in writing; the existence of partnership property; and the sharing of profits and losses. *See, e.g., Bowers v. Opthamology Grp., LLC*, 2012 WL 3637529, at *5 (W.D. Ky. Aug. 22, 2012) (rev'd on other grounds) (quoting *Wheeler v. Hurdman*, 825 F.2d 257, 276 (10th Cir. 1987)). Not surprisingly, the parties disagree over these facts at length.

The defendants contend that the lack of a written partnership agreement is significant. Specifically, they observe that Haymaker and Gatton are sophisticated parties, each "with a hoard of lawyers that could . . . draft whatever agreements they desired." [Record No. 52, p. 3] Additionally, each time Haymaker purchased a parcel of land from Gatton, "[t]he parties were meticulous in documenting their transactions." *Id.* at 9. And it is clear that Gatton and Haymaker knew how to execute a written agreement when they wished to form a business together. Specifically, they executed detailed documentation when they formed Beaumont Shoppes LLC in 1996, of which they were the only two members. [*See* Record No. 52-53.]

Haymaker testified that, despite his request to do so, Gatton "wouldn't put anything in writing" with respect to the alleged partnership. [Record No. 59-3, p. 26] Around the time the parties began the Tuscany and Coventry projects, Haymaker again told Gatton he wanted to put the terms of their agreement in writing.[6] But Gatton refused, stating that he does not sign agreements with partners or developers because, in addition to protecting his tax strategy, "he wanted them to be afraid if work slowed, or did not progress as [he] wanted, they would potentially lose their positions, profits or income." [Record Nos. 52-13; 59-3, pp. 27-28] Haymaker testified that Gatton "loved to threaten people" that he could back out at any time. Haymaker also conceded that he had "always known that as long as [Gatton] had title to the property that he could . . . stop selling." *Id.* at 30.

Although not dispositive, it is also noteworthy that there were no other formal indicia of a partnership, such as filings made with the Secretary of State or partnership tax filings. Additionally, the alleged partnership did not hold any joint accounts and did not have a name. Despite the lack of an express agreement, Haymaker contends that the parties' business relationship constituted a partnership. *See Roethke v. Sanger*, 68 S.W.3d 352, 358 (Ky. 2001) (observing that circumstantial evidence may be used to find the existence of an actual partnership).

### 2.    A factual dispute exists with respect to profit sharing.

The parties strongly disagree regarding whether they shared profits and losses. Haymaker maintains that the parties shared profits pursuant to the previously described 70-30 formula for determining the sales prices of the parcels of land that Haymaker purchased from

---

[6]      Tuscany is a residential development within the Hamburg acreage.

Gatton.  The defendants dispute this claim, asserting that once the sales prices were set, Haymaker owed Gatton those amounts regardless of the actual sales prices to third parties.

Haymaker counters that this rationale ignores the rollforward schedule, which allowed for adjustments on future transactions if a property performed better or worse than expected. Gatton contends that this makes no difference because Haymaker did not receive "profits;" instead, any rollforward was reflected in additional loans from Gatton to buy more property. Kentucky Revised Statutes § 362.180(4)(a) provides that "[t]he receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment: (a) [a]s a debt by installments of otherwise[.]"

Haymaker suggests that § 362.180(4)(a) does not apply because the parties' relationship has partnership attributes as opposed to the "mere lending of money."  [Record No. 59, p. 19 (citing *Edward v. Johnson*, 292 S.W.750 (Ky. 1927).]  In support, Haymaker points to the extensive and thorough documentation maintained by both parties which, Haymaker contends, demonstrates that the profits cannot be classified simply as repayment of a loan.  Further, Haymaker contends, Gatton took an unsecured promise on each of the units that incorporated his cost basis, anticipated profits, and carrying costs, solely so that Gatton could treat the proceeds as capital gains.

"The name given to the transaction or the parties is not conclusive, but the character of the transaction, as well as the relationship of the parties, depends upon the terms of their agreement."  *Edwards*, 292 S.W. at 751.  The defendants maintain that, once Gatton sold a parcel to Haymaker, Haymaker was solely responsible for development and marketing the lots for sale.  [Record No. 52-6, p. 41]  Further, the defendants contend, Haymaker was solely

responsible for negotiating and securing any loans for development of the land.  Likewise, Haymaker had no control over Gatton's land prior to the time of sale—Gatton leased the undeveloped land to whomever he wanted and donated parcels of it to whomever he desired.

Haymaker disputes this.  He says that two emails from Gatton's accountant Danny Dunn "cement the fact" that the parties jointly developed the property.  On September 10, 2014, Dunn sent Haymaker an email with the subject line "lots."  It stated:

> Tim:
> I talked with Mr. Gatton about the fact that we are getting low on lots and that you will need to take down some original acreage soon.  He suggested that you call him when you return from your vacation to discuss and we will go from there.

On April 17, 2019, Haymaker emailed Dunn referring to a "monster deal."  Dunn responded:

> Tim:
> The numbers you shared are revealing.  We are fortunate to have the best building lots in Lexington.  You do such a good job. . . .  I look forward to hearing more about the monster deal regarding the Ky River property."[7]

[Record Nos. 59-6, 59-7]

Based on Dunn's emails and the nature of the rollforward schedule, a reasonable factfinder could conclude that Haymaker and Gatton shared profits.

### 3.    Haymaker has alleged an at-will partnership, at best.

Kentucky law contemplates that the issue of whether a partnership exists is a question of fact to be determined by a jury.  *Thale*, 2008 WL 4386768, at *4 (citing *Caudill v. Finley Bros.*, 4 S.W.2d 368 (Ky. Ct. App. 1928)).  Ultimately, however, that question need not be resolved.  Assuming that Haymaker has pointed to some evidence of a partnership, it has not

---

[7]    According to Haymaker, the "Ky River property" relates to the Coventry development. [Record No. 59, p. 23]

identified any evidence of a partnership agreement that would require the defendants to convey the remaining Hamburg and Coventry acreage to Haymaker.

Haymaker has conceded on several occasions that the alleged partnership agreement had no defined scope or duration. For instance, he testified repeatedly in his deposition that Gatton had the ability to stop selling land to him at any time. Only after talking to his attorneys during a lunch break did he walk back his response and suggest that Gatton would face some unidentified consequence for doing so. [*See* Record No. 59-3, p. 39.] Haymaker's alternative characterization of the parties' dealings as a series of individual joint ventures further undercuts his claim of a long-term partnership agreement to develop all of Gatton's property. *See Roethke*, 68 S.W.3d at 364 (explaining that a joint venture is a "special type of partnership" defined as "an informal association of two or more persons, partaking of the nature of a partnership, usually, but not always, limited to a single transaction in which the participants combine their money, efforts, skill, and knowledge for gain, with each sharing in the expenses and profits or losses").

Haymaker testified that he understood that Gatton alone owned the Hamburg and Coventry properties and was not required to sell any of it to Haymaker. [Record No. 59-3, pp. 30-31] According to Haymaker, he never asked Gatton for an agreement to sell all of the Hamburg property to him. Instead, he "already had that in [his] mind that that was the deal" because Gatton had allegedly told Pat Madden that Haymaker would be developing of all of the property. *Id.* at 28. While Haymaker may have hoped that was the deal, there is simply no evidence to indicate that Gatton ever agreed to it.

The mere fact that no time is provided for the duration of a partnership does not render a contract of partnership void. *Johnson v. Jackson*, 114 S.W. 260, 261 (Ky. 1908). Instead, it

- 12 -

is a partnership at will, "which either partner may dissolve at any time, at his option, without concurring liability for damages to his copartner, however serious the loss occasioned thereby." *Id.; see also Gordon v. Gordon*, 163 S.W.2d 454, 456 (Ky. 1942) (observing that a partnership at will can be dissolved "on a moment's notice, provided the withdrawing partner acts in good faith and at a reasonable time"); K.R.S. § 362.300(1)(b) (where no definite term of particular undertaking is specified, dissolution is caused by the express will of any partner).

Assuming *arguendo* that the parties were involved in a partnership under the facts as alleged, Gatton was within his rights to terminate it when he decided that he no longer wanted to do business with Haymaker. Haymaker entirely failed to respond to this argument in response to the defendants' motion for summary judgment and has failed to otherwise explain why the defendants should be forced to sell the remaining Hamburg and Coventry property to Haymaker. Accordingly, the defendants' motion for summary judgment with respect to the plaintiffs' claims for breach of partnership agreement will be granted.[8]

### 4. Alternatively, Hamburg and Coventry are not partnership property.

Haymaker contends that the Gatton Trust holds the Hamburg and Coventry properties for the benefit of the alleged partnership. If real estate was not paid for with partnership funds, a presumption arises that it is not partnership property. *Wilhite's Adm'r v. Boulware*, 10 S.W. 629, 630 (Ky. 1889). This presumption may be rebutted only by a "clear manifestation of partnership intent." *Pendleton v. Strange*, 381 S.W.2d 617 (Ky. 1964).

Haymaker contends that he negotiated the sale of the Hamburg property between Gatton and the Maddens and that he "put the whole deal together" for Coventry. However, it

---

[8]     Neither party addresses it, but the breach of fiduciary duty claims also will be dismissed, since they depend on the success of the underlying breach of partnership claims.

is undisputed that Gatton paid for each of these properties with his own funds and that each property is deeded solely to the Trust.  Haymaker acknowledged repeatedly during his deposition that the property belongs to Gatton and that Gatton is not required to sell it to Haymaker:

> Q:      [Y]ou understood that if for whatever reason, if [Gatton] woke up one day and changed his mind and said, I don't think I like Tim Haymaker anymore and I don't want to do business with him anymore, he had the right to stop selling property to you?
>
> A:      He had the right to stop selling to me.
>
> Q:      Okay.  And you knew that on the [Hamburg] property, correct?
>
> A:      Very seldom did we ever have any kind of confrontation, but when we did, he might bring it up, I don't have to sell you this land.  I understood that. I'm not—I'm not naïve.
>
> Q:      I'm going to call it Coventry.  Isn't it true that you also understood that he did not have to sell you the Coventry property if he chose not to?
>
> A:      I think it's a safe assumption.
>
> Q:      And to this day, he has sold off portions [of the land] to you but the remaining balance of the—of the Madden property belongs solely to Mr. Gatton, correct?
>
> A:      Correct, yes.

[Record No. 59-3]

    In response to the defendants' motion for summary judgment, Haymaker makes a handful of undeveloped arguments in support of the assertion that Hamburg and Coventry are partnership property.  First, Haymaker reports that both Haymaker and the defendants were required to sign off on any amendments to restrictive covenants for Tuscany and Coventry. However, the restrictive covenants specify that the Trust is the owner of its specified portion of the real property and that Haymaker is the owner of its specified portion.  The defendants

contend that the purpose of having both parties sign the documents is to prevent each party from taking actions *on their own property* that could potentially devalue the land of the adjacent property owner.  [Record No. 66, p. 7]  Regardless, Haymaker has not explained how these documents show that Hamburg and Coventry are partnership property.  Instead, Haymaker ultimately cites them as additional evidence that a partnership exists.

Next, Haymaker states that he had explicit and specific powers of attorney to handle matters related to the properties to which the Trust held title.  However, these were limited powers of attorney allowing Haymaker to record plats for property that it purchased and specifically provided that Haymaker had no authority to transfer or convey any interest in the property that was still titled to Gatton.  If the parties were in a partnership, it is unlikely that Haymaker would have needed a written power of attorney to perform such limited acts.  *See Farmer v. Bank of Wickliffe*, 51 S.W. 586, 587-88 (Ky. 1899); *Bull v. Harris*, 1857 WL 4394, **3 (Ky. June 26, 1857)*.

Without explanation, Haymaker asserts that "the numerous proformas and other accounting documents" show that the property was held for the benefit of the partnership.  The Court has reviewed the cited document and it is not facially evident how this demonstrates that the property was held for the benefit of the partnership.  [*See* Record No. 59-13.]  Haymaker also contends that the defendants have failed to bring forth evidence of any sales of the subject property that did not involve Haymaker.  While this may be a consideration with respect to the existence of a partnership, Haymaker does not explain why it points to the existence of partnership property.  Further, Haymaker knew as early as June 2020 that Gatton was considering donating portions of the land, but did not object based on the existence of the alleged partnership.  [Record No. 59-3, p. 81]

Haymaker also argues that, over the years, he made improvements to the property to benefit the developments overall.  For example, Haymaker contends that he spent $250,000 on a sewer line that he placed "next to the Gatton property."   [Record No. 59-3, pp. 33-34] Haymaker explained that this would save Gatton money on the sewer when developing his property in the future.  He also reports that he worked on the infrastructure of all of the developments, including zoning and environmental issues. *Id.* at p. 40.  As a result, he believes he has some interest in all of the defendants' property.  But this does not constitute "clear manifestation of partnership intent" sufficient to rebut the presumption that Hamburg and Coventry belong solely to the defendants.  *See Pendleton v. Strange*, 381 S.W.2d 617 (Ky. 1964).  As Haymaker conceded as his deposition, the services he provided are those normally performed by a developer and he earned at least 25 million dollars based on his deals with Gatton. *Id.*

### B.      The Defendants' Counterclaim—Slander of Title

Eleven days after filing this lawsuit, Haymaker filed a notice of lis pendens in Fayette Circuit Court regarding the remaining Hamburg and Coventry property.  Lis pendens is defined as "[a] notice, recorded in the chain of title to real property, . . . to warn all persons that certain property is the subject matter of litigation, and that any interests acquired during the pendency of the suit are subject to its outcome."   The baseless filing of a notice of lis pendens can serve as the foundation for a slander of title action.  *See Ballard v. 1400 Willow Council of Co-Owners, Inc.*, 430 S.W.3d 229 (Ky. 2013).

To prove a claim for slander of title to property under Kentucky law, the plaintiff must establish that the defendant has knowingly and maliciously communicated, orally or in writing, a false statement which has the effect of disparaging the plaintiff's title to property, and the

- 16 -

plaintiff has incurred special damages as a result. *Id.; Bonnie Braes Farms, Inc. v. Robinson*, 598 S.W.2d 765, 766-67 (Ky. Ct. App. 1980). Special damages may consist of either a loss by the plaintiff of a sale of the property or a diminution in its fair market value. *Id.* (citing *Continental Realty Co. v. Little*, 117 S.W. 310 (1909)).

Haymaker maintains that it has a property interest in the remaining Hamburg and Coventry acreages based on an alleged partnership agreement. However, as previously explained, Haymaker has not alleged sufficient facts from which a jury could determine that Haymaker has any ownership interest in these properties. Accordingly, the notice of lis pendens' assertion that that Haymaker's Complaint affects Gatton's "right, title, interest, and claim" of the property constitutes a false statement. *See Bonnie Braes Farms, Inc.*, 598 S.W.2d at 767.

In support of their claim for special damages, the defendants have provided the expert report and deposition testimony of Jeffrey Lagrew. [Record Nos. 55-22; 55-23] Lagrew, a Kentucky certified real property appraiser with more than three decades of experience, explained that Haymaker's lis pendens creates a cloud on Gatton's title to the property and renders the property unsellable until it determined that the lis pendens will be removed. The plaintiff does not respond to Lagrew's opinion and has failed to otherwise rebut the defendants' assertion that they have suffered special damages as a result of Haymaker's filing of lis pendens.

The only remaining consideration is whether Haymaker acted with malice in filing the notice of lis pendens. The defendants urge the Court to determine, as a matter of law, that he did. But Kentucky courts have observed that this is a question of fact that falls peculiarly within the province of a jury. *See Goode v. Wall*, 1878 WL 12421 (Ky. Apr. 23, 1878). The

defendants have identified a handful of cases from outside this district in which courts determined that a litigant's admissions were such compelling evidence of malice or bad faith that summary judgment was appropriate. *See In re Stollman*, 404 B.R. 244 (E.D. Mich. 2009) (debtor acted with malice when she admittedly concealed and spent 401(k) proceeds for her own personal benefit even though she expressly acknowledged plaintiffs had liens on proceeds); *Osuna v. Pompo*, 2020 WL 1627672 (S.D. Cal. Apr. 2, 2020) (malice was established when defendant admitted that he initiated plaintiff's criminal prosecution so that he could maintain possession of property); *see also Montecalvo v. Mandarelli*, 682 A.2d 918, 924, 925 (R.I. 1996) (finding that the *jury* reasonably concluded that Montecalvo recorded lis pendens maliciously).

The defendants contend that Haymaker has "unequivocally admitted" that he did not file the notice of lis pendens because he actually disputes Gatton's rights, title, and interest in the property. Instead, the defendants assert, Haymaker did so to "jam up any potential sale or transfer of the property, cloud its good and marketable title, and leverage Gatton into settlement." [Record No. 53, p. 20] However, Haymaker's admissions are not as clear cut as those in the cases upon which the defendants rely. During his deposition, Haymaker was asked the purpose of his lis pendens notice. [Record No. 58-14, p. 30] He stated that it was to "put the world on notice that there was something going on in the legal world. . . . That there was a misunderstanding that required it to go all the way to a lawsuit . . . so that somebody wouldn't come in and buy the piece of property or attempt to buy the piece of property and find out, after the fact. . . ." *Id.*

While Haymaker acknowledged repeatedly that the remaining property belongs solely to Gatton, he maintained a vague theory that he also had an interest in the property based on

- 18 -

his prior development of property that Gatton had sold to him. *See id.* at 31. This is in contrast to the facts described in *Stollman* and *Osuna* in which the offending parties freely admitted they that acted in willful contravention of the law. Ultimately, it will be for a jury to decide whether Haymaker acted maliciously in filing the notice of lis pendens.

## IV.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.     The defendants' motion for summary judgment with respect to all claims in the plaintiff's Complaint [Record No. 52] is **GRANTED**.

2.     The defendants' motion for summary judgment with respect to the defendants' counterclaim [Record No. 53] is **GRANTED**, in part, and **DENIED**, in part.

3.     The plaintiff's motion for summary judgment with respect to the defendants' counterclaim [Record No. 58] is **DENIED**.

4.     Subject to intervening orders, this matter remains scheduled for a jury trial beginning on March 29, 2022, at the United States District Court in Lexington, Kentucky. Issues for trial are limited to whether the plaintiff acted with malice in filing the notice of lis pendens and, if so, the amount of the defendants' resulting damages.

Dated: February 8, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky